The court incorporates by reference in this paragraph and adopts as the findings and orders
of this court the document set forth below. This document was signed electronically at the
time and date indicated, which may be materially different from its entry on the record.



Russ Kendig
United States Bankruptcy Judge

Dated: 03:32 PM October 27, 2021

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | CHAPTER 7 |
| | ) | |
| ANN M. GERLING, | ) | CASE NO. 21-61052 |
| | ) | |
| Debtor. | ) | RUSS KENDIG |
| | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| | ) | **(NOT FOR PUBLICATION)** |
| | ) | |

Before the court is the chapter 7 trustee's application to employ Richard T. Kiko Agency, Inc. ("Kiko") as his realtor to auction real property. No objections were filed. For the reasons set forth below, the court cannot approve the application.

The court has subject matter jurisdiction of this case under 28 U.S.C. § 1334 and the general order of reference issued by the United States District Court for the Northern District of Ohio. General Order 2012-7. This is a statutorily core matter under 28 U.S.C. § 157(b)(2)(A) and the court has authority to enter final orders in this matter. Pursuant to 28 U.S.C. § 1409, venue in this court is proper.

This opinion is not intended for publication or citation. The availability of this opinion, in electronic or printed form, is not the result of a direct submission by the court.

## BACKGROUND

Debtor filed her chapter 7 case on August 2, 2021. She owns two parcels of real estate, one located in Wyandot County and one in Hardin County. She valued the Wyandot property at $160,000.00. She owes approximately $46,000.00 to Huntington Bank on the mortgage, plus approximately $1,150.00 in real estate taxes. The Hardin property is valued at $60,000.00. Premier Bank is owed roughly $32,500.00 on its mortgage. Trustee seeks to sell the properties by auction, using Kiko as the realtor and auctioneer.

Per the application to employ Kiko, compensation is as follows:

> Subject to court approval, the Trustee and the Realtor have agreed that the Realtor is to be paid as follows: ten percent (10%) of the highest bid, plus expenses estimated to be $1,500.00. A buyer's premium of ten percent (10%) will be added to the highest bid to establish the purchase price. The buyer's premium will be applied to the Realtor's commission so the estate will receive the highest bid amount less expenses.

(App. To Employ ¶ 4, ECF No. 34.)

## DISCUSSION

In recent months, the court has reviewed various applications to employ auctioneers, issuing two opinions: In re Leedy, Case No. 21-60338, 2021 WL 3671115 (Bankr. N.D. Ohio 2021) and In re Yeater, Case No. 21-60861, 2021 WL 4699047 (Bankr. N.D. Ohio 2021). The law was aptly stated in those opinions and will not be restated, being incorporated by reference. The driving force in the court's review, and the issuance of the opinions, is a concern that auction fees are not always reasonable and frequently misleadingly disclosed.

It is also often difficult to determine what is reasonable because fees may vary from court to court. For example, the court found the following fees were awarded to auctioneers this year:

> In re Peters, Case No. 19-33827. The trustee hired Denver Geitgey, of Don Rose Auction and Realty, to sell auction a lot in Fostoria, Ohio valued at $13,000.00. The auctioneer's commission was 10%, plus expenses, with no commission paid on any buyer's premium.[1] The lot sold for $5,500.00, and the auctioneer received $550.00 in fees and $200.00 in expenses.

> In re White, Case No. 20-51449. The trustee hired Richard Kiko to auction real estate in Deerfield, Ohio. The auctioneer's commission was not to exceed 7%, plus expenses. The sale brought $55,000.00, resulting in a $3,850.00 fee award, plus $2,144.33 in expenses.

> In re Armstrong, Case No. 19-41375. The trustee hired Ronald Roman, of George Roman

---

[1] No buyer's premium was disclosed in the application or the report of sale.

Auctioneers, to sell a lot in Erie, PA. The auctioneer's commission was 6%, with a $1,000.00 minimum, plus expenses. The sale brought $5,500.00 and the auctioneer received a $1,000.00 commission plus $357.13 in commissions.

<u>In re Talbot</u>, Case No. 20-31522. The trustee hired Brent Wilson of Wilson Auction & Realty Co., Ltd. to auction a one-half acre vacant lot. His commissions was 10%, not including any buyer's premium, plus expenses. The highest bid was $3,000.00. Auctioneer was awarded $300.00 with no expenses.[2]

After reviewing the above, the court cannot find that Kiko's fees in this case are reasonable. It charged 3% less in the <u>White</u> case. Many or most auctioneers charge 6% in normal times rather than 7% in the earlier case. Moreover, in today's booming real estate market, many agents are voluntarily reducing commissions without even being asked. This is not a market where premium fees should be expected or demanded.

This is not a small dollar auction like three of the four cases listed above. The court may be more amenable to a higher, or flat, commission when the auctioneer may not receive a reasonable amount for the work to be done. The facts do not indicate this is such a case. But more compelling is that none of the four cases identified a buyer's premium as part of the final auction price.

The use of the buyer's premium results in misleading disclosure at best. One court said a buyer's premium is "indistinguishable from a direct charge to the estate by the auctioneer for his services." <u>In re Maropa Marine Sales Serv. and Storage, Inc.</u>, 92 B.R. 547, 548 (Bankr. S.D. Fla. 1988). Comparably, it has also been defined as "adding the sales commission as an obligation to the buyer after the bid." Dennis J. Connolly, *Current Issues in Auction Sales,* Norton Annual Survey of Bankruptcy Law 2, § III(C)(4) (2005) (citing Leslie H. Miles, Jr., *Buyer's Premium*, Am. Bankr. Inst. J., Oct. 1999, at 26). And that is the exact effect of the compensation proposed in this case: the buyer's premium is the auctioneer's commission.

Use of the buyer's premium convolutes the traditional understanding of the bid price, defined as "the highest price that a prospective buyer is willing to pay for a security at a given time," and the hammer price, "the final price at an auction, where the auctioneer traditionally knocks the lectern with a gavel to announce that the item up for auction has been sold a certain bidder at a specified price." Black's Law Dictionary (11th ed. 2019). Adding the buyer's premium after the fact fictionalizes both concepts.

Black's Law Dictionary defines price as "the amount of money or other consideration given exchange for something else, the cost at which something is bought or sold." Black's Law Dictionary (11th ed. 2019). A buyer's premium constitutes part of the price, comporting with the definition of purchase price, which is the "price actually paid for something, esp. a house." Id. While auctioneers tend to try to separate the concept of bid price and purchase price, the buyer's premium is part of the price, which is what someone pays to obtain rights to the item being sold.

---

2 No buyer's premium was identified in the report of sale or compensation award to the auctioneer.

This distortion also provides fuel for the debate over whether buyer's premium negatively impact auction results and disadvantage the seller.

> It is also argued, at least implicitly, that the estate does not suffer from the presence of the premium since it is paid directly by the buyer, not the estate. Others, however, see the premium as a charge ultimately borne by the seller:
>
>> Educated sellers almost universally dislike buyer's premiums. They feel, and accurately so, that the buyer's premium is primarily coming out of their own pocket.... The more experienced the auction seller, the more negative their opinion of buyer's premiums. The only sellers that seem to like the buyer's premiums are those that have been erroneously convinced that the premium is not costing them anything. Weidenhamer at *2. How can a premium charged to and paid by the buyer cost the seller? In essence, the idea is that "[w]hen buyers reduce their bid prices to compensate for buyer's premiums, the seller's revenue is negatively impacted [.]" *Id*.
>
> The impact of the premium is admittedly difficult to discern and may differ depending on the particular facts and circumstances of a given auction.

In re Driller, 2004 WL 1661981, *4 (Bankr. D. Ida. 2004) (footnotes omitted) (citing Deb Weidenhamer, *Buyer's Premium: To Charge or Not to Charge*, Auction World, http://www.auctionandappraise.com/ARTICLES/BPTOCHARGE.HTM (last visited July 1, 2004)). If bidders are reducing their bid price to accommodate for a buyer's premium, it is the estate that bears the cost.

For the reasons set forth above, the court will not approve the terms set forth in the application to employ. An order will be entered immediately reflecting this decision.

# # #

**Service List:**

Anthony J. DeGirolamo
3930 Fulton Drive NW, Suite 100B
Canton, OH 44718

Patti Baumgartner-Novak
612 S Main Street
Heck Bldg
#104
Findlay, OH 45840

Richard T. Kiko Agency, Inc.
Attn: George Kiko
2722 Fulton Drive NW
Canton, Ohio 44718